1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7   PHILIP SHEN, et al.,

     Plaintiffs,

8      v.

9   ALBANY UNIFIED SCHOOL DISTRICT,
et al.,

10      Defendants.

11  RICK ROE, et al.,

     Plaintiffs,

12     v.

13  ALBANY UNIFIED SCHOOL DISTRICT,
et al.,

14      Defendants.

15

16  JOHN DOE,

     Plaintiff,

17     v.

18  ALBANY UNIFIED SCHOOL DISTRICT,
et al.,

19      Defendants.

20

21  C.E.,

     Plaintiff,

22     v.

23  ALBANY UNIFIED SCHOOL DISTRICT,
et al.,

24      Defendants.

Case Nos. 3:17-cv-02478-JD (lead case)
     3:17-cv-02767-JD
     3:17-cv-03418-JD
     3:17-cv-03657-JD


**ORDER RE SUMMARY JUDGMENT
MOTIONS**

Re: Dkt. No. 43 in 3:17-cv-02478-JD

25    These cases arise out of disciplinary actions taken by Albany Unified School District

26  ("AUSD" or "the District") in response to racist and derogatory content posted on an Instagram

27  account by several students at Albany High School ("AHS").  A student created the account in

28  November 2016 and gave access to a group of AHS students.  In March 2017, the AHS student

United States District Court
Northern District of California

body and school personnel discovered the account and its contents.  AUSD expelled the account's creator and suspended the other students involved.  AUSD also sponsored a variety of events in response to the situation, including a "restorative justice" session that culminated in threats, and in some cases physical assaults, against the disciplined students and their families.  Plaintiffs, who are the disciplined students, allege violations of free speech and due process under the federal constitution and California state law, and have sued the District and its officials[1] to set aside the disciplinary actions, among other relief.

In this order, the Court resolves the freedom of speech issues only.  These questions are central to plaintiffs' lawsuits, and the parties agreed to address them early on summary judgment.  Dkt. No. 71.[2]  Because the ten plaintiffs have filed several separate complaints, all of which have been related but not consolidated for case management purposes, and because the parties filed multiple overlapping motions and cross-motions for summary judgment, the litigation is a procedural thicket.  Reduced to the pertinent essentials, plaintiffs filed motions for summary judgment on their First Amendment claims, and the District filed a cross-motion on the same issue.  *See* Dkt. No. 43 (motion for partial summary judgment); Dkt. No. 59 (District's cross-motion); Dkt. No. 72, Dkt. Nos. 40 and 42 in *Roe*, Dkt. No. 16 in *Doe*, Dkt. No. 13 in *C.E.* (opposition to District's cross-motion and additional cross-motions); Dkt. No. 55 in *Roe* (District's consolidated reply).  This order applies to the First Amendment and related state law claims alleged in all of the complaints by all plaintiffs.

## BACKGROUND

For summary judgment purposes, the parties agree on the material facts.  In November 2016, AHS student C.E. created a private Instagram account with the handle @yungcavage, and invited several AHS students to follow it.[3]  Dkt. No. 13-1 ¶ 7 in *C.E.*  Only the express invitees

---

[1] The named defendants include AUSD as well as AHS officials, teachers, and AUSD Board of Education officials.  All named defendants have appeared jointly in these cases.  For convenience, in the rest of this order, the Court refers to AUSD as the representative defendant.  The Court takes up individual defendants' qualified immunity arguments at the end of the order.

[2] Unless otherwise specified, citations to the docket are to the lead case, Case No. 17-2478.

[3] Some of the plaintiffs of minor age requested permission to proceed pseudonymously, which the Court granted.  Dkt. No. 88.

were able to see or react to the posts by commenting or by liking them.  By March 2017, at least nine AHS students could access the @yungcavage account.  Some of the approved followers were C.E.'s close friends, and others were just passing acquaintances.  *See, e.g.*, Dkt. No. 54-5 ¶ 2 in *Roe*.

Between November 2016 and March 2017, @yungcavage made thirty to forty posts.  Dkt. No. 13-1 ¶ 7 in *C.E.*  The posts in large part targeted fellow AHS students and school personnel with racist and derogatory comments, often with a picture identifying the target.  *See* Dkt. No. 60-8 Exh. A ("Set 1"); Dkt. No. 60-9 ("Set 2").  Among other images, these posts depicted:

- A "Ku klux starter pack" featuring a noose, a burning torch, a black doll, and a white hood.  Set 1 at ECF p.12.

- A screenshot of an African-American student from her own Instagram page, which she had captioned "i [sic] wanna go back to the old way," juxtaposed with an image of a white man beating a black slave hung by his hands.  The image posted by @yungcavage is captioned, "Do you really tho?"  *Id.* at ECF p.17.

- An AHS student and the AHS basketball coach, both of whom are African-American, with nooses drawn around their necks, captioned, "twinning is winning."  *Id.* at ECF p.22.

- A screenshot of a Snapchat conversation where a female African-American AHS student asks C.E. to delete a video he posted online.  In that video, a male student touches her hair without her permission.  In the screenshotted conversation, C.E. refuses to take down the video.  The post is captioned: "Holy shit I'm on the edge of bringing my rope to school on Monday."  *Id.* at ECF p.24; *see also* Dkt. No. 60-3 ¶ 3.

- "Things The World Wouldn't Have If Black People Didn't Exist", including "United States avg. IQ: 98", a KKK hood, and men dressed in orange prison garb.  Set 2 at ECF p.7.

- The back of a female African-American AHS student's head, captioned "Kamryn or amber" and "Fucking nappy ass piece of shit."  *Id.* at ECF p.9.

- Multiple comparisons of African-American women and students to gorillas.  *Id.* at ECF p.3; Set 1 at ECF p.19.

- The back of a female African-American AHS student's head captioned "Fuck you."  Set 2 at ECF p.10.

3

- Screenshot of an iPhone's text replacement page, showing that the phone auto-corrects the word "nigger" to "nibber."  Captioned: "Making my texts more black friendly."  *Id.* at ECF p.13.

In total, ten different AHS students were depicted on the account, and several photos were taken on school property.  Dkt. No. 55-4 at 13 in *Roe*.  The parties agree that C.E., the creator of the @yungcavage account, made all the original posts on the account.  *See* Dkt. No. 13-1 ¶ 7 in *C.E.*  With one exception, the other students disciplined by the District liked or commented on the posts, or took photographs that ended up on the account, but did not directly post images.  *See, e.g.*, Dkt. No. 43-1 at ECF pp.2-3, 7, 15.  One student, pseudonymous plaintiff Nick Noe, had access to the account but never commented on or otherwise responded to it online.  Dkt. No. 40-1 ¶¶ 5-7 in *Roe*.  C.E. states, and the District does not dispute, that he did not post any images to his Instagram account during school or on school property.  Dkt. No. 13-1 ¶ 7 in *C.E.*  The other plaintiffs similarly state that they did not access Instagram, comment on, or like any images during school or on school property.

The pretense of keeping the @yungcavage account private evaporated on the weekend of March 17, 2017, when the *Doe* plaintiff showed some of C.E.'s posts to two of the targeted AHS students, both African-American.  Dkt. No. 16-1 ¶ 7 in *Doe*.  One of those students saw photos of herself, including a photo of her and her basketball coach with nooses drawn around their necks.  Dkt. No. 60-12 ¶ 8.  She also saw a post about auto-correcting "nigger" to "nibber," a photo of her next to a napping student (which she took as a reference to "nappy" hair), and comments made by the account's followers that denigrated the intelligence of African-Americans.  *Id.*

News of the @yungcavage account spread to other AHS students over the weekend.  *Id.* ¶ 13 (student heard of account on Sunday).  On the morning of Monday, March 20, at school, a student who had heard about the account asked one of the plaintiffs if she could borrow his phone to make a call.  Dkt. No. 54-3 ¶ 10 in *Roe*.  She took his phone to a bathroom, where she accessed his Instagram application and took photos of @yungcavage posts using her own phone.  *Id.*  She did this at the request of a friend who had heard about the account over the weekend and wanted to see the posts.  *Id.*

United States District Court
Northern District of California

1   By lunchtime on Monday, a visibly distraught and agitated group of students -- several of

2   whom were targets of the account -- had gathered in a school hallway.  Some students were in

3   tears, others were yelling.  AHS Principal Anderson heard the disturbance from his office and

4   brought the students into a conference room.  Dkt. No. 59-1 ¶ 2.  This was AUSD's first

5   awareness of the Instagram account.

6   By afternoon, many more students had obtained copies of the @yungcavage posts.  Dkt.

7   No. 60-8 ¶ 8.  News about the situation spread rapidly through the school.  One student, for

8   example, learned about the account on a high school club chat line that Monday morning.  Dkt.

9   No. 60-5 ¶ 2.  C.E. discovered that his account had become public knowledge and disabled it that

10  day.  Dkt. No. 13-1 ¶ 9 in *C.E.*  On the evening of the same day, he permanently deleted the

11  account.[4]  *Id.*

12  By June 2017, AUSD had suspended each of the account's followers for various periods of

13  time.  *See, e.g.*, Dkt. No. 43 at 3.  AUSD permanently expelled C.E from AHS.  Dkt. No. 13-1 in

14  *C.E.* ¶ 14.

15  ## LEGAL STANDARDS

16  The parties seek summary judgment on whether AUSD's disciplinary actions violated

17  plaintiffs' free speech guarantees under the First Amendment and the California Education Code.

18  "A party may move for summary judgment, identifying each claim or defense -- or the part of each

19  claim or defense -- on which summary judgment is sought.  The Court shall grant summary

20  judgment if the movant shows that there is no genuine dispute as to any material fact and the

21  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may dispose

22  of less than the entire case and even just portions of a claim or defense.  *Smith v. State of*

23  *California Dep't of Highway Patrol*, 75 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014).

24  Under Rule 56, a dispute is genuine "if the evidence is such that a reasonable jury could

25  return a verdict" for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

26  fact is material if it could affect the outcome of the suit under the governing law.  *Id.* at 248-49.

27
28
[4] The photos taken by the AHS student on the morning of March 20 are the only remaining visual record of the images, comments, and likes on the @yungcavage account.  Those photos do not capture all the activity on the account.

To determine whether a genuine dispute as to any material fact exists, a court must view the evidence in the light most favorable to the non-moving party and draw "all justifiable inferences" in that party's favor. *Id.* at 255.

The primary legal question presented for summary judgment is whether plaintiffs' Instagram activity -- their posts, their comments, their likes, and that they followed the @yungcavage account -- was protected from school discipline by the First Amendment. It is of course a "bedrock principle" under the First Amendment that the government cannot prohibit or penalize the expression of an idea "simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). It is also beyond dispute that the First Amendment protects not only literal speech but also conduct with expressive elements. Conduct may be protected speech for purposes of the First Amendment if there was intent to convey a particularized message, and "great" likelihood that that message would be understood by viewers. *Id.* at 404.

The wrinkle here is that the speech and conduct involved a public high school and its students. The "constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). "Schools must achieve a balance between protecting the safety and well-being of their students and respecting those same students' constitutional rights." *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1148 (9th Cir. 2016) (internal citation omitted).

Consequently, "school speech" is not analyzed under the traditional First Amendment framework. Rather, as our circuit has determined, a school-specific framework applies: "vulgar, lewd, obscene, and plainly offensive speech" is governed by *Fraser*; "school-sponsored speech" is governed by *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); "speech promoting illegal drug use" is governed by *Morse v. Frederick*, 551 U.S. 393 (2007); and speech that falls into none of these categories is governed by *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). *See generally Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1067 (9th Cir. 2013).

Earlier decisions addressing school speech often focused on whether the speech occurred on- or off-campus. Geographic location is still a relevant factor, *Wynar,* 728 F.3d at 1068, but

6

strict tests of locality are not compatible with the online methods of communication in our digital age.  In response to our internet world, where today's students are particularly comfortable residents, the courts have developed updated approaches to analyzing school speech issues.  Our circuit has "identified two tests used . . . to determine when a school may regulate off-campus speech."  *C.R.*, 835 F.3d at 1149.  The first test looks for a sufficient nexus between the speech and the school and was applied by the Fourth Circuit in *Kowalski v. Berkeley County Schs.*, 652 F.3d 565 (4th Cir. 2011).  The second test asks whether it was reasonably foreseeable that the off-campus speech would reach the school and was applied by the Eighth Circuit in *S.J.W. v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771 (8th Cir. 2012).  The Ninth Circuit has declined to choose between the two approaches, noting that both tests "rely on the speech's close connection with the school to permit administrative discipline."  *C.R.*, 835 F.3d at 1151 n.4.

AUSD argues that plaintiffs' activities satisfied both the nexus and reasonable foreseeability approaches, and so were subject to discipline as school speech.  Plaintiffs dispute that mainly on the grounds that the challenged communications happened off-campus in a private online forum.  If the plaintiffs' Instagram activity was indeed school speech, the parties further disagree over whether it was protected under *Tinker*.  *Tinker* does not protect student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others."  *Tinker*, 393 U.S. at 513.  AUSD says it could discipline the plaintiffs for their speech, which both substantially disrupted school and which infringed on the rights of other students.  Plaintiffs argue that they neither caused substantial disruption, nor interfered with the rights of others.

## DISCUSSION

### I.  The Instagram Activity Falls Under The First Amendment

All of the challenged actions occurred on a social media site, and the parties dispute the extent to which the First Amendment applies to all of the online conduct.  Plaintiffs interacted with the @yungcavage account in different ways.  Plaintiff C.E. created the account and uploaded the original posts.  Other plaintiffs commented.  Still others only liked some posts, and one plaintiff had account access but did not post a comment or indicate a like.

United States District Court
Northern District of California

1      Without question, the original posts and verbal comments are within the scope of the First

2    Amendment.  This applies to C.E., Philip Shen, Nima Kormi, Michael Bales, Kevin Chen, John

3    Doe of the *Roe* action, and the *Doe* plaintiff, all of whom posted either original content or verbal

4    comments.

5      Plaintiffs Rick Roe and Paul Poe liked some of the posts without adding any text.  This too

6    is expression covered by the First Amendment.  On the Instagram phone application, a user can

7    like an image either by tapping a heart-shaped icon under the post or by double-tapping the image

8    itself.  A notification goes out to the poster that someone has liked his or her post, and the like is

9    also visible to anyone else who can see the post.  This action broadcasts the user's expression of

10    agreement, approval, or enjoyment of the post, which is clearly speech protected by the First

11    Amendment.  *See Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013), as amended (Sept. 23,

12    2013) ("liking" Facebook political campaign page is substantive speech); *see also City of Ladue v.*

13    *Gilleo*, 512 U.S. 43, 55 (1994) (displaying signs is substantive speech even though it "may not

14    afford the same opportunities for conveying complex ideas as do other media").

15      The parties' disagreement is sharpest in the case of Nick Noe.  Noe and defendants contest

16    whether he has any First Amendment claim at all from just following the @yungcavage postings.

17    Defendants say that he does not because he was, at most, a passive consumer of content and not an

18    active speaker.  Noe's own declaration goes to some length to state that he joined only at C.E.'s

19    request and that he "never accessed the account to view any of the dialogue or images that were

20    posted" and was not aware of its content until he was questioned by AUSD officials on March 21.

21    Dkt. No. 40-1 ¶¶ 5-7 in *Roe*.

22      Both sides frame their debate in terms of whether Noe was engaged in affirmative

23    expressive conduct, but the better approach is to view his activity as that of a reader.  The First

24    Amendment protects readers as well as speakers.  "The right of freedom of speech and press

25    includes not only the right to utter or to print, but the right to distribute, the right to receive, [and]

26    the right to read."  *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965).  *See also Stanley v.*

27    *Georgia*, 394 U.S. 557, 564 (1969) ("right to receive information and ideas, regardless of their

28    social worth").  This principle has been applied specifically to students and schools.  *Bd. of Educ.,*

*Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (right to receive information is "inherent corollary" of rights explicitly guaranteed by First Amendment). As a follower of online content, Noe is no different for First Amendment purposes than the pre-internet readers discussed in these cases. It is also worth noting that AUSD disciplined Noe for viewing the @yungcavage posts, which is precisely the type of government conduct that these cases condemned under the First Amendment.

Looking for a moment beyond the speech issues, the disciplinary action against Noe is troubling in many respects. From the record before the Court, it appears that Noe did nothing more than have access to the posts, and the District agrees that Noe's conduct was "completely devoid of any affirmative expressions or purpose, action, or ideology." Dkt. No. 55-4 at 7 in *Roe*. It is not clear how Noe or any student would have known that online access or viewing alone could result in a suspension, and it is even less clear how a suspension for those reasons squares with our traditional ideas of freedom of thought, due process, and fairness. Giving schools the power to control what students are permitted to look at online is a deeply problematic proposition. These aspects of Noe's case will likely be addressed more fully in later proceedings. For now, the Court finds that Noe engaged in protected First Amendment activity.

**II. The Instagram Activity Was School Speech**

The next issue is whether plaintiffs' online conduct qualifies as school speech potentially subject to greater regulation by school authorities. The answer to this question entails "a circumstance-specific inquiry to determine whether a school permissibly can discipline a student for off-campus speech." *C.R.*, 835 F.3d at 1150. In making that determination, our circuit applies the nexus and reasonable foreseeability tests. *Id.*

As the Ninth Circuit said in *Wynar*, the nexus test is exemplified by the Fourth Circuit's approach in *Kowalski*. In *Kowalski*, Musselman High student Kara Kowalski created a MySpace discussion group where she and over two dozen Musselman students ridiculed a fellow student as a "whore" infected with herpes. *Id.* at 567-68. Kowalski argued that she could not be disciplined for speech that took place at home after school. The Fourth Circuit disagreed, finding a sufficient nexus between Kowalski's speech and the school. The court noted that the group consisted

United States District Court
Northern District of California

predominantly of students at Musselman High, the group was named S.A.S.H. for "Students Against Slut Herpes," the dialogue foreseeably took place between Musselman students and impacted the school environment, and the group thread was understood by the victim as an attack "made in the school context." *Id.* at 573.

The undisputed facts here amply satisfy the nexus test and its focus on "the subject and addressees" of the speech at issue. *Wynar*, 728 F.3d at 1069. The followers were mainly AHS students, and the posts featured ten different AHS students as well as school personnel. Some of the most offensive posts -- for instance, the image of nooses drawn around the necks of an African-American student and an African-American basketball coach -- depicted school activities and were clearly taken on campus, even if not posted to Instagram from campus. Dkt. No. 60-14 ¶ 3. Other posts were directly responsive to events that took place at school. For instance, one post related to an argument that C.E. had with a female African-American AHS student. In February 2017, C.E. had recorded a video of another male AHS student touching her hair without her permission. Dkt. No. 60-3 ¶ 3. C.E. then posted it on an Instagram account (not @yungcavage) visible to other AHS students. The female student asked C.E. to delete the video, both in person and via Snapchat. *Id.* ¶ 4. C.E. posted a screenshot of that Snapchat conversation on @yungcavage and captioned it, "Holy shit I'm on the edge of bringing my rope to school on Monday." Set 1 at ECF p.24.

The same result is readily reached under the Eighth Circuit test, which asks whether it was reasonably foreseeable that the speech or conduct would reach the school and create a risk of a substantial disruption. *S.J.W. v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 777 (8th Cir. 2012). In *S.J.W.*, two students created a blog with racist content as well as sexually degrading comments about specifically identified female classmates. *Id.* at 773. The two students used a Dutch domain site to prevent anyone from finding their blog using a Google search and told only six school friends about their blog. They intended the blog to be a secret, but "whether by accident or intention, word spread quickly." *Id.* at 774. The *S.J.W.* court found that it was reasonably foreseeable that the blog might reach the school because it "targeted" the school. *Id.* at 778.

United States District Court
Northern District of California

Similarly, the Ninth Circuit has found that it is reasonably foreseeable for speech made by students about other students to reach a school.  *Wynar*, 728 F.3d at 1069.

The undisputed facts here also satisfy the "reasonable foreseeability" test.  Like the speech in *Wynar* and in *S.J.W.*, the activity was targeted to the school.  Posts, comments, and likes were made by students and about students, and it was precisely the targeted nature of the content on the @yungcavage account that led the *Doe* plaintiff to show the account to others.  Moreover, plaintiffs' activity on Instagram appear to have been related to ongoing social tensions at school, which again increased the likelihood their speech would reach and disturb the campus.  The District has offered evidence that some of the activity on the account was co-extensive with a campaign of offensive comments directed by C.E. and his school friends at a group of female African-American students.  For example, at the time the *Doe* plaintiff showed the posts to his two friends, he explained "that his friend group thinks they are superior to her group, because her group's hair is too nappy and their skin is too dark." Dkt. No. 60-12 ¶ 8.  One student targeted by the @yungcavage account reported that C.E. had previously texted her with a racial slur and then blamed the text on Kevin Chen.  Dkt. No. 60-12 ¶ 14.  Another student targeted by the @yungcavage account reported that C.E. had told her she should be lynched, and that Kevin Chen and C.E. had called her and her friends "'nigger' using the hard 'r' at the end." Dkt. No. 60-6 ¶ 7.  These circumstances made it reasonably foreseeable that the contents of the account would eventually reach and disrupt AHS.

In opposition to both tests, plaintiffs say that the private and self-contained nature of the Instagram account takes it out of the domain of school speech, *see, e.g.*, Dkt. No. 43 at 10, but that is not at all the case.  As an initial matter, none of the Fourth, Eighth, or Ninth Circuit's decisions have focused on a student's subjective intent for speech to remain private.  And the record does not support a finding that maintaining privacy was an essential element of plaintiffs' conduct.  Although C.E. states that he allowed access only to close friends, two of the plaintiffs have stated that they did not know C.E. well.  Dkt. No. 54-3 ¶ 2 in *Roe*; Dkt. No. 54-5 ¶ 2 in *Roe*.  This undercuts C.E.'s suggestion that the account was an intimate forum for friends with a shared understanding of each other's privacy expectations.  It also does not appear that C.E. ever

instructed his followers to keep information about the account private, even though at least one of the followers was a friend of AHS students targeted by the account. Nor does it appear that anyone other than C.E. determined who was allowed to follow the account and who was not. Plaintiffs who commented on and liked posts had little reason to believe their conduct would stay secret when they could not control who was allowed to follow the account at all. In addition, it is common knowledge that little, if anything, posted online ever stays a secret for very long, even with the use of privacy protections.

Plaintiffs' other efforts to avoid the school speech domain are equally unavailing. They say that this treatment would make school officials "the final *de facto* judge and disciplinarian for all student conduct not only inside of school but also outside the school." Dkt. No. 43 at 9; Dkt. No. 13 at 11 in *C.E.* That goes too far. The threshold question of whether speech is "school speech" does not resolve the scope of protection offered by the First Amendment. Under *Tinker*, school speech may be constitutionally restricted or disciplined only if it risks a substantial disruption of the school environment or violates the rights of other students to be secure. *Tinker*, 393 U.S. at 513.

The *Shen* plaintiffs suggest that Ninth Circuit precedent forecloses *Tinker*'s application to speech that is not either a threat of physical violence as in *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001), or *Wynar*, or sexual harassment occurring near school property or immediately after school as in *C.R.* Dkt. No. 72 at 9. That also is not the case. Those may have been the specific facts involved in the circuit's opinions, but the circuit has expressly contemplated that *Tinker* may apply to "websites dedicated to disparaging or bullying fellow students." *Wynar*, 728 F.3d at 1069. Here, there is no question that the speech at issue satisfies threshold tests like the nexus test adopted by the Eighth Circuit or the reasonable foreseeability test adopted by the Fourth. *Id.* Plaintiffs' argument also unduly slights the fact that schools are responsible for preventing not only acts of violence or assault, but also harassment and bullying. *Kowalski*, 652 F.3d at 572.

### III. Most Of The Plaintiffs Were Properly Disciplined

Since plaintiffs' speech was school speech, *Tinker* governs the review of defendants' disciplinary measures. *Tinker* allows schools to discipline speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker*, 393 U.S. at 513. School officials do not have to wait for the disruption or invasion to take place; they may act prophylactically if it is reasonable under the circumstances. *See LaVine*, 257 F.3d at 989; *Wynar*, 728 F.3d at 1070. The reasonable foreseeability test also focuses on the risk of disruption, and does not require a disturbance to erupt before the school may act. *See, e.g.*, *S.J.W.*, 696 F.3d at 777-78.

AUSD's authority under *Tinker* to discipline C.E., the creator and main content supplier for the @yungcavage account, is not open to serious question. "In the school context, . . . [t]he cases do not distinguish between 'substantial disruption' caused by the speaker and 'substantial disruption' caused by the reactions of onlookers or a combination of circumstances." *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 778 (9th Cir. 2014) (as amended Sept. 17, 2014) (petition for rehearing en banc denied). That fits well here because a cascade of disruptive events immediately followed the public disclosure of C.E.'s @yungcavage account. After the disclosure, the students who first gathered in the hallway were "all too upset to go to class" and "were crying hysterically and talking loudly about the posts." Dkt. No. 60-6 ¶ 3. One school administrator stated, "I had never seen a group of students as upset as these girls were. The intensity of the crying and the yelling was very disturbing and disruptive." Dkt. No. 60-12 ¶ 3.

The level of disruption then rose even higher. School officials called in mental health counselors to help calm down the students. Dkt. No. 60-8 ¶ 5. After reviewing the posts and comments depicting and referencing the KKK, lynching, and nooses, District officials called the Albany police because "the posts could be construed as threats of violence." Dkt. No. 60-12 ¶ 4. That afternoon, the police and District officials conducted interviews with targeted students and their parents. *Id.* ¶ 7. Many of the targeted students were unable to resume school in a normal way. One student missed multiple days of school and tests out of embarrassment and fear. Dkt. No. 60-5 ¶ 4. Another stated that she has had a hard time in school ever since March because she

feels "paranoid about classmates taking photographs of me and using them in the most offensive ways." Dkt. No. 60-3 ¶ 17.

While administrators dealt with targeted students and their parents on the afternoon of the 20th, news of the account quickly spread throughout the school at large. By March 21, faculty members reported that classes were disrupted by upset students who wanted to talk about the situation. Dkt. No. 59-1 ¶ 19.

Taken as a whole, the record firmly establishes that C.E. caused a substantial disruption at AHS. That is enough under *Tinker* to support defendants' disciplinary measures, and consideration of whether C.E. also invaded the rights of others is not necessary. Plaintiffs try to minimize the level of disruption by blaming the District for over-reacting, but it is clear that with or without the intervention of school officials, the students learned about the @yungcavage account and had very strong reactions to it while at school. That the disruption fell short of a full-scale riot is also of no moment. C.E. suggests that anything less than that is not sufficient under *Tinker*, Dkt. No. 13 at 18 in *C.E.,* but the Supreme Court hardly indicated that *Tinker* applies only when the school is in flames or out of control. *See also Kowalski v. Berkeley County Schools*, 652 F.3d at 574 (school may act early to avoid continuing and more serious harm).

Defendants also properly disciplined plaintiffs Philip Shen, Kevin Chen, the *Doe* plaintiff, Rick Roe, and Paul Poe, all of whom expressed approval of or liked posts that specifically targeted students at AHS when, among other incidents:

- Philip Shen commented "yep" on C.E.'s post mocking an African-American student who said that she wanted to "go back to the old way." Next to a photo of the student, C.E. had posted a picture of a black slave being beaten by a white man and captioned the picture, "Do you really tho?" Set 1 at ECF p.17.

- Kevin Chen commented "Its[sic] too good" on a post comparing an African-American AHS student to a gorilla. Set 2 at ECF pp.3-4. On that post, Chen responded "no fuck YOU you dirty zookeeping son of a bitch" to a commenter who wrote "Hey not funny/Fuck you/Delete this." Chen also provided some of the photos of AHS students that ended up on the @yungcavage account and took at least one of those photos in class. Dkt. No. 60-8 ¶¶ 25-26.

- The *Doe* plaintiff liked posts including a photo comparing an African-American female student to a gorilla and the post captioned "Holy shit I'm on the edge of bringing my rope to school on Monday."  Set 2 at ECF p.3, Set 1 at ECF p.24.  He commented with three laughing emojis on a post that compared an AHS student's rear end to a tub of cottage cheese.  Set 1 at ECF p.15.

- Rick Roe liked C.E.'s post about going "back to the old way" (described above).  Set 1 at ECF p.17.  Roe also liked C.E.'s post showing the back of an African-American female student's head and "Fucking nappy ass piece of shit," Set 2 at ECF p.9, and a post that compared a female student's body to that of Jabba the Hutt. Set 1 at ECF p.21.

- Paul Poe liked almost every post at issue in this case, including the post where nooses were drawn around the necks of an African-American AHS student and an African-American basketball coach, and the post where C.E. said in reference to an African-American AHS student, "Holy shit I'm on the edge of bringing my rope to school on Monday."  Set 1 at ECF pp.22, 24.

There is no doubt that these plaintiffs meaningfully contributed to the disruptions at AHS by embracing C.E.'s posts in this fashion.  The evidence shows that AHS students were upset precisely because others, namely these plaintiffs, had supported C.E.'s conduct.  *See, e.g.*, Dkt. No. 60-3 ¶ 15 (student "devastated" that classmates had "'liked' and encouraged the racists [*sic*] posts"); Dkt. No. 60-4 ¶ 7 (when student saw seven likes on C.E.'s comment of "Holy shit I'm on the edge of bringing my rope to school on Monday," student felt "disgusted and scared" and "threatened"); Dkt. No. 60-6 ¶ 12 (student depicted in "back to the old way" post felt "upset" and "unwelcome" that other students "approved of C.E.'s comment and the picture by liking it or posting 'yep'").

While that alone is again enough under *Tinker*, these plaintiffs also clearly interfered with "the rights of other students to be secure and to be let alone."  *Tinker*, 393 U.S. at 508.  As our circuit has held, while speech that is "merely offensive to others" does not come within *Tinker*, the precise scope of the interference language is unclear.  *C.R.*, 835 F.3d at 1152 (internal quotation omitted).  Nevertheless, good guidelines exist for determining what constitutes impermissible interference with the rights of other students.  In *C.R.*, for example, our circuit held that sexually harassing conduct toward a student violates her right to be secure because it "threaten[s] the

15

United States District Court
Northern District of California

individual's sense of physical, as well as emotional and psychological, security." *C.R.*, 835 F.3d at 1152.  The same can be said for the racist and derogatory comments plaintiffs made here about their peers.  In both cases, the speech "positions the target as a[n] . . . object rather than a person" and thereby violates the targeted student's right to be secure.  *C.R.*, 835 F.3d at 1152.

*Kowalski* is also instructive.  In upholding discipline imposed on a student for online harassment and intimidation of a peer, the court emphasized that personally derogatory speech is "not the conduct and speech that our educational system is required to tolerate, as schools attempt to educate students about 'habits and manners of civility' or the 'fundamental values necessary to the maintenance of a democratic political system.'" *Kowalski*, 652 F.3d at 573 (quoting *Fraser*, 478 U.S. at 681).

Whatever the outer boundary might be of *Tinker*'s interference inquiry, these cases establish that students have the right to be free of online posts that denigrate their race, ethnicity or physical appearance, or threaten violence.  They have an equivalent right to enjoy an education in a civil, secure, and safe school environment.  C.E., Philip Shen, Kevin Chen, the *Doe* plaintiff, Rick Roe, and Paul Poe impermissibly interfered with those rights.

Some of the plaintiffs have tried to minimize their culpability by saying that their likes were made casually and thoughtlessly.  *See, e.g.*, Dkt. No. 54-5 in *Roe*.  But a plaintiff's subjective state of mind is irrelevant.  Under *Tinker*, the inquiry is whether the speech at issue interfered with the rights of other students to be secure and let alone.  The District has established that it did.

While AUSD was within its rights to discipline most of the students here, the four remaining plaintiffs stand in a different position.  The record does not show that plaintiffs Kormi, Bales, Nick Noe, and plaintiff Doe in the *Roe* action either approved of or adopted any content targeting specific individuals at AHS.  For example:

- Nima Kormi commented on one post, "This account is racism solely directed at black people" with an emoji of a laughing face. Set 1 at ECF p.27.  The post itself is a close-up of the face of a white male.  The comment is ambiguous and the District has not presented any evidence as to why Kormi's comment would have invaded the rights of a specific student.

- Michael Bales commented, "Pls tell me who's the owner to this amazing account" on the post titled "things the world wouldn't have if black people didn't exist." Set 2 at ECF pp.7-8. Although Bales admitted to also liking some posts, those posts are not identified.

- Nick Noe followed the account but, as discussed, there is no evidence that he did anything more.

- Plaintiff Doe in the *Roe* action commented "Stupid nibber" on the post about auto-correcting "nigger" to "nibber." Set 2 at ECF p.13. On the post about going "back to the old way," he commented, "I hope I never end up on this account." Set 1 at ECF p.17.

On this evidence, a reasonable jury could not find that Kormi, Bales, or plaintiffs Noe or Doe in the *Roe* action interfered with the rights of other students. Endorsement or encouragement of speech that is offensive or noxious at a general level differs from endorsement or encouragement of speech that specifically targets individual students. The former is much more akin to the "merely" offensive speech that is beyond the scope of *Tinker*. Although some of these plaintiffs' conduct may have been experienced as hurtful and unsettling by classmates, the Court cannot say that their involvement affirmatively infringed the rights of other students to be secure and to be let alone.

For similar reasons, these plaintiffs did not create a substantial risk of disruption from their conduct. The District has not tendered any evidence showing that Kormi, Bales, or Noe or Doe of the *Roe* action contributed to the disruptions at AHS, and so has failed to carry its burden on summary judgment as to those four plaintiffs.

**IV. *Doe* plaintiff's punishment for additional speech**

The *Doe* plaintiff initially received a two-day suspension on March 23. Dkt. No. 16 at 3 in *Doe*. On March 24, the *Doe* plaintiff's friend -- the student he showed the @yungcavage account to on March 18 -- asked the *Doe* plaintiff if he had any other racist conversations to send her. The *Doe* plaintiff sent her a screenshot of a group chat.

The *Doe* plaintiff was suspended for three more days for sending the screenshot, which AUSD administrators justified because the screenshot "tossed gasoline on the fire." Dkt. No. 16-1

United States District Court
Northern District of California

¶ 2 in *Doe*.  In its consolidated reply, the District did not address the *Doe* plaintiff's argument about his second suspension or present any responsive evidence.  Dkt. No. 55-4 in *Roe*.  On that basis, the District's motion for summary judgment as to the second suspension of the *Doe* plaintiff is denied.

### V.   Plaintiffs' "heckler's veto" claims and *Doe* plaintiff's 56(d) motion

Some plaintiffs have raised a "heckler's veto" claim.  They argue that the District punished them in part because it wanted to appease outraged Albany community members.   Dkt. No. 42 at 7 in *Roe*; Dkt. No. 16 at 10 in *Doe*.  "The term 'heckler's veto' is used to describe situations in which the government stifles speech because it is 'offensive to some of [its] hearers, or simply because bystanders object to peaceful and orderly demonstrations." *Dariano*, 767 F.3d at 778 n. 7.

This is not a well-taken argument.  The Ninth Circuit has definitively rejected the heckler's veto doctrine in school speech cases.  "We recognize that, in certain contexts, limiting speech because of reactions to the speech may give rise to concerns about a 'heckler's veto.'  But the language of *Tinker* and the school setting guides us here.  Where speech 'for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others,' school officials may limit the speech." *Id.*, 767 F.3d at 778 (citing *Tinker*, 383 U.S. at 513).  If that was not clear enough, Judge O'Scannlain, dissenting from a denial of a petition for rehearing en banc, characterized the panel's opinion as holding that "the heckler's veto doctrine does not apply to schools." *Id.* at 772.

That disposes of plaintiffs' heckler's veto argument.  The *Doe* plaintiff's Rule 56(d) motion, which is based on his stated need for additional discovery on the heckler's veto issue, is denied.  Dkt. No. 20 in *Doe*.

### VI. Disciplinary records

Some plaintiffs have argued that even if their suspensions were constitutional, recording those suspensions in their permanent academic records is not.  Dkt. No. 43 at 16; Dkt. No. 13 at 19 in *C.E.*  They rely on *LaVine v. Blaine School Dist.*, 257 F.3d 981, 992 (9th Cir. 2001).  In *LaVine*, plaintiff LaVine wrote a poem where the narrator kills 28 people in a school shooting.  He then

United States District Court
Northern District of California

gave the poem to his English teacher for feedback.  The school expelled LaVine on an emergency basis.  Later, LaVine was evaluated by a psychiatrist who recommended after three meetings that LaVine be allowed to return to school.  The school placed a letter in LaVine's record explaining that he had been expelled for safety reasons, but the letter did not refer to LaVine's successful psychiatric evaluations, which had "satisfied [the school] that James was not a threat to himself or others."  *Id.* at 990-992.  The court found that because the disciplinary record did not refer to "later, ameliorating events," the letter "went beyond the school's legitimate documentation needs."  *Id.* at 992.

Unlike in *LaVine*, plaintiffs have pointed to no "later, ameliorating" events that would justify updating or removing their disciplinary records.  There is no indication that their records of suspension or expulsion are incomplete or mischaracterize the facts.  The request to remove the disciplinary records is denied.

### VII. The California Education Code Claims

Some of the plaintiffs mention, in quite cursory fashion, that California Education Code Sections 48950(a) and 48907(a) provide independent speech protections.  Section 48950(a) provides that schools may not discipline pupils "solely on the basis of conduct that is speech or other communication that, when engaged in outside of the campus, is protected from governmental restriction by the First Amendment to the United States Constitution or Section 2 of Article I of the California Constitution."  Cal. Educ. Code § 48950(a).  Section 48907(a) provides in relevant part that public school students "shall have the right to exercise freedom of speech and of the press."  Cal. Educ. Code § 48907(a).

Plaintiffs barely briefed these statutes, and the case law on the scope of protection offered by Sections 48950(a) and 48907(a) is quite sparse.  The Court would be well within its discretion not to address this underdeveloped argument at all, but notes that both statutes seem readily distinguishable from the facts of this case.  Section 48950(a) mentions speech that is protected if "engaged in outside of the campus," but as previously discussed in detail, the online communications in this case were closely tied to the school and its students.  Plaintiffs add the somewhat odd argument under Section 48950(a) that Instagram is "a full public and not a limited

19

public platform, and strict scrutiny, should nonetheless apply." Dkt. No. 43 at 18; *see also* Dkt. No. 13 at 20 in *C.E.*  The forum analysis plaintiffs propose applies only to government restrictions on speech on public property.  *Lopez v. Tulare Joint Union High Sch. Dist.*, 34 Cal. App. 4th 1302, 1328 (1995) (forum analysis weighs "government's interest in limiting the use of its property to its intended purpose" against "interest of those wishing to use the property for other purposes").  As plaintiffs themselves emphasize, the speech at issue here took place on a "non-governmental, non-school related" platform.  Dkt. No. 43 at 17.

 Similarly, the legislative history of Section 48907(a) indicates that it is "a statutory embodiment of the *Tinker* and related First Amendment cases at that time."  *Lopez*, 34 Cal. App. 4th at 1318.  While Section 48907(a) may go beyond the Constitution and Section 48950(a) in guaranteeing particular rights to students publishing in school-sponsored publications such as school newspapers, those extended protections are not relevant here.

**CONCLUSION**

In light of the multiplicity of overlapping motions, the Court offers this substantive guide to the holdings in this order:

Summary judgment is granted in favor of Nima Kormi, Michael Bales, Nick Noe, and John Doe of the *Roe* action.  Summary judgment is granted in favor of the District with respect to plaintiffs C.E., Philip Shen, Kevin Chen, Rick Roe, and Paul Poe.  Summary judgment is also granted in favor of the District with respect to the *Doe* plaintiff except on the issue of his additional suspension time, for which summary judgment is granted in his favor.  All remaining summary judgment motions are denied, as is the *Doe* plaintiff's Rule 56(d) motion.

As a final note, the District appended to its main arguments a cursory reference to qualified immunity.  The reference is underdeveloped legally and factually, and the District did not differentiate between the conduct of the ten different plaintiffs for immunity purposes.  The Court declines to take up qualified immunity on this inadequate record.  The parties are directed to meet

United States District Court
Northern District of California

and confer about whether any qualified immunity issues remain after this order, and if so, to jointly propose to the Court a schedule for resolving them.

**IT IS SO ORDERED.**

Dated:  November 29, 2017

_____
JAMES DONATO
United States District Judge